**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

LUIS RICARDO MAYEA-PULIDO, AKA Luis Ricardo Pulido,
*Defendant-Appellant*.

Nos. 18-50223
18-50224

D.C. Nos.
3:18-cr-07021-WQH-1
3:17-cr-00560-WQH-1

OPINION

Appeal from the United States District Court
for the Southern District of California
William Q. Hayes, District Judge, Presiding

Argued and Submitted July 10, 2019
Pasadena, California

Filed January 3, 2020

Before: Milan D. Smith, Jr. and Michelle T. Friedland,
Circuit Judges, and Stanley A. Bastian,* District Judge.

Opinion by Judge Friedland

---

*The Honorable Stanley A. Bastian, United States District Judge for the Eastern District of Washington, sitting by designation.

## SUMMARY[**]

### Criminal Law/Immigration

The panel affirmed a conviction for illegal reentry by a previously deported alien in violation of 8 U.S.C. § 1326, and the revocation of supervised release, in a case in which the defendant argued that, by making his parents' marital status a factor in the determination of derivative citizenship, 8 U.S.C. § 1432(a) (1996) violates the Constitution's equal protection guarantee.

The defendant's equal protection challenge focused on the difference between 8 U.S.C. § 1432(a)(1), which allows the child of parents who are not legally separated to derive citizenship only upon the naturalization of both parents, and the first clause of 8 U.S.C. § 1432(a)(3), which allows the child of legally separated parents to derive citizenship upon the naturalization of one parent if that parent has sole legal custody. The defendant argued that this statutory scheme impermissibly discriminates on the basis of parental marital status by allowing the children of legally separated parents to become U.S. citizens more easily than the children of non-separated parents. He argued that he should have automatically become a United States citizen as a result of the naturalization of one of his parents prior to the reentry in question, and that, as a result, he is not an "alien" who could be guilty of violating § 1326.

*Barthelemy v. Ashcroft*, 329 F.3d 1062 (9th Cir. 2003), rejected a similar equal protection challenge to § 1432(a).

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The defendant argued that *Sessions v. Morales-Santana*, 137 S. Ct. 1678 (2017), which held that a statutory scheme that imposed different requirements on unwed mothers and unwed fathers for conferring citizenship upon the birth of a child abroad denied equal protection, effectively overruled *Barthelemy*.

The panel agreed with the defendant that *Barthelemy*'s justification for applying rational basis review—that immigration statutes must always be given deference and thus reviewed only for rationality—is clearly irreconcilable with *Morales-Santana*, which left open the possibility that a court may apply heightened scrutiny to a citizenship provision if there is otherwise a basis to do so. The panel held that for reasons separate and apart from those relied on in *Barthelemy*, rational basis review applies to § 1432(a)'s classifications of children based on their parents' marital status at a time after their birth or on a parent's custody status over them.

Reviewing § 1432(a) for a rational basis, the panel wrote that it remains bound by the holding in *Barthelemy* that the statute survives that deferential standard; and that even if it were not bound by *Barthelemy*, it would conclude that § 1432(a) is rational because protecting the parental rights of the non-citizen parent is plainly a legitimate legislative purpose.

**COUNSEL**

Kara Hartzler (argued), Assistant Federal Public Defender, Federal Defenders of San Diego, Inc., San Diego, California, for Defendant-Appellant.

Mark R. Rehe (argued), Assistant United States Attorney; Helen H. Hong, Assistant United States Attorney, Chief, Appellate Section, Criminal Division; Robert S. Brewer, Jr., United States Attorney; United States Attorney's Office; San Diego, California; for Plaintiff-Appellee.

**OPINION**

FRIEDLAND, Circuit Judge:

Luis Mayea-Pulido challenges his conviction for illegal reentry, which he contends is invalid because he is not an "alien" who could be guilty of that crime. Mayea argues that he should have automatically become a United States citizen as a result of the naturalization of one of his parents prior to the reentry in question. But because his parents were married, and the derivative citizenship statute at 8 U.S.C. § 1432(a) (1996) required married parents to *both* naturalize to confer citizenship to their child, he did not become a citizen. Mayea argues that, by making his parents' marital status a factor in the derivative citizenship determination, § 1432(a) violates the Constitution's equal protection guarantee. We previously upheld the statute's constitutionality in *Barthelemy v. Ashcroft*, 329 F.3d 1062 (9th Cir. 2003), but Mayea contends that the Supreme Court's recent decision in *Sessions v. Morales-Santana*, 137 S. Ct. 1678 (2017), compels a different conclusion. We disagree and affirm Mayea's conviction.

## I.

Luis Mayea-Pulido was born in 1978 in Mexico to two unmarried non-U.S. citizens. Mayea and his parents moved to the United States a few months after his birth, and his parents married in 1981. By the time Mayea was eight years old, his father was a naturalized U.S. citizen. Mayea eventually became a lawful permanent resident, but he never applied for citizenship. Mayea's mother, who remained married to his father, also never applied for citizenship.

At the time Mayea turned eighteen, 8 U.S.C. § 1432 (1996)[1] governed whether a lawful permanent resident under the age of eighteen and born abroad to non-U.S.-citizen parents could derive U.S. citizenship from the subsequent naturalization of one or both parents. *Id.* § 1432(a). As a general rule, a child lawfully residing in the United States automatically became a citizen if both of his or her parents naturalized before his or her eighteenth birthday. *Id.* § 1432(a)(1).

There were three exceptions to this general rule. First, if the parents had married and then legally separated, only the parent "having legal custody of the child"—which we have interpreted to mean sole legal custody—needed to naturalize

---

[1] Section 1432 was repealed in 2000 and replaced by a different provision governing automatic derivative citizenship. Child Citizenship Act of 2000, Pub. L. No. 106-395, §§ 101, 103, 114 Stat. 1631, 1631–33. Under that provision, either parent's naturalization confers derivative citizenship on lawful permanent resident children under the age of eighteen who were born outside the United States. *See* 8 U.S.C. § 1431(a). But the new rule is not retroactively applicable to individuals, such as Mayea, who had already turned eighteen when the new statute went into effect. *See Hughes v. Ashcroft*, 255 F.3d 752, 760 (9th Cir. 2001). All references to § 1432 herein are to the 1996 version, which was identical to the version repealed in 2000.

for the child to derive citizenship.  *Id.* § 1432(a)(3); *see United States v. Casasola*, 670 F.3d 1023, 1030–31 (9th Cir. 2012) (holding that "legal custody" in the context of § 1432(a)(3) means sole legal custody).  Second, if one parent was deceased, the naturalization of the surviving parent alone conferred citizenship.  8 U.S.C. § 1432(a)(2).  Third, if "the child was born out of wedlock and the paternity of the child ha[d] not been established by legitimation," the mother's naturalization alone sufficed to confer citizenship. *Id.* § 1432(a)(3).

Mayea did not derive citizenship under § 1432(a).  The general rule in § 1432(a)(1) did not apply to him because only one of his parents had naturalized before his eighteenth birthday.  Nor did any of the three exceptions apply to him. He therefore remained a non-citizen.

Over the years following his eighteenth birthday, Mayea was convicted of several crimes.  In 2003, the Government revoked his lawful permanent resident status and deported him.  He illegally reentered the United States and was deported nine more times before reentering in 2008.  In 2010, Mayea was apprehended by immigration officers and eventually pleaded guilty in 2015 to illegal reentry in violation of 8 U.S.C. § 1326, which criminalizes reentry by "any alien who . . . has been denied admission, excluded, deported, or removed" pursuant to a removal order.  After his release from custody, he was placed on supervised release and deported again, but soon returned to the United States.  In 2017, immigration agents again detained Mayea and charged him with illegal reentry for the second time. The case proceeded to trial in the U.S. District Court for the Southern District of California.

A jury found Mayea guilty.  Mayea moved for judgment of acquittal, arguing that § 1432 was unconstitutional as

applied to him. He argued that under § 1432(a), he would have derived citizenship through his father alone had his parents been legally separated, but that he did not because they remained married. Mayea contended that this disparity showed that the statute discriminated on the basis of parental marital status in violation of the constitutional guarantee of equal protection. He urged the court to remedy this purported constitutional defect by allowing him to retroactively derive citizenship solely from his father's naturalization. As a citizen, he would not be an "alien" who could be convicted of illegal reentry.

The district court rejected Mayea's argument and denied acquittal, sentencing him to 65 months in prison and three years of supervised release. Because this new conviction for illegal reentry violated the terms of Mayea's supervised release for his 2015 conviction, the district court also revoked that supervised release term and added eight months of imprisonment to his new sentence. Mayea timely appealed. On appeal, he continues to press his argument that § 1432(a) denies equal protection.

## II.

We review de novo both a district court's denial of a motion for judgment of acquittal and its determinations regarding the constitutionality of a statute. *United States v. Jinian*, 725 F.3d 954, 959 (9th Cir. 2013); *United States v. Zakharov*, 468 F.3d 1171, 1176 (9th Cir. 2006).

To determine the standard of review applicable to an equal protection challenge to a statutory classification, we

ask whether the classification implicates a protected class.[2] *Dent v. Sessions*, 900 F.3d 1075, 1081 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 1472 (2019).  If it does, we apply some form of heightened scrutiny, requiring the government to satisfy a more exacting burden for the classification to pass constitutional muster.  *Clark v. Jeter*, 486 U.S. 456, 461 (1988).  If it does not, and if there is no other reason to apply heightened scrutiny,[3] we must uphold the classification "if there is any reasonably conceivable state of facts that could provide a rational basis" for it.  *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993).

## III.

Mayea's equal protection challenge focuses on the difference between § 1432(a)(1), which allows the child of parents who are not legally separated to derive citizenship only upon the naturalization of both parents, and the first

---

[2] Section 1432 involves action by the federal government, so it is subject to the Fifth Amendment's prohibition against "discrimination that is so unjustifiable as to be violative of due process."  *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1686 n.1 (2017) (quoting *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975)).  Our approach to evaluating a Fifth Amendment claim alleging such a due process violation is "precisely the same as to equal protection claims under the Fourteenth Amendment."  *Id.* (quoting *Weinberger*, 420 U.S. at 638 n.2).

[3] Mayea has not argued that § 1432(a) impinges on fundamental rights or is motivated by animus, which may be other bases for applying more exacting scrutiny.  *See Short v. Brown*, 893 F.3d 671, 679 (9th Cir. 2018) (explaining that heightened scrutiny applies when "a state . . . burden[s] a fundamental right for some citizens but not for others"); *Mountain Water Co. v. Mont. Dep't of Pub. Serv. Regulation*, 919 F.2d 593, 598 (9th Cir. 1990) (recognizing that a form of "heightened scrutiny" may be applicable when "Congress's only purpose in enacting [a law] was to harm . . . 'a politically unpopular group.'" (quoting *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973))).

clause of § 1432(a)(3), which allows the child of legally separated parents to derive citizenship upon the naturalization of one parent if that parent has sole legal custody.[4]

---

[4] The full text of the version of § 1432(a) applicable to Mayea provides:

> (a) A child born outside of the United States of alien parents, or of an alien parent and a citizen parent who has subsequently lost citizenship of the United States, becomes a citizen of the United States upon fulfillment of the following conditions:
>
> > (1) The naturalization of both parents; or
> >
> > (2) The naturalization of the surviving parent if one of the parents is deceased; or
> >
> > (3) The naturalization of the parent having legal custody of the child when there has been a legal separation of the parents or the naturalization of the mother if the child was born out of wedlock and the paternity of the child has not been established by legitimation; and if
> >
> > (4) Such naturalization takes place while such child is under the age of eighteen years; and
> >
> > (5) Such child is residing in the United States pursuant to a lawful admission for permanent residence at the time of the naturalization of the parent last naturalized under clause (1) of this subsection, or the parent naturalized under clause (2) or (3) of this subsection, or thereafter begins to reside permanently in the

In Mayea's telling, this statutory scheme impermissibly discriminates on the basis of parental marital status by allowing the children of legally separated parents to become U.S. citizens more easily than the children of non-separated parents. For the reasons that follow, Mayea's argument fails.

## A.

We rejected a similar equal protection challenge to § 1432(a) in *Barthelemy v. Ashcroft*, 329 F.3d 1062 (9th Cir. 2003). Barthelemy, the petitioner in that case, was like Mayea the child of a couple that was not legally separated (although Barthelemy's parents could not have legally separated because they never married in the first place). *Id.* at 1063–65. Barthelemy's father had naturalized before Barthelemy turned eighteen; his mother had not. *Id.* at 1064–65. We held that Barthelemy did not derive citizenship through § 1432(a)(3) "because his natural parents never married and thus could not [have] *legally* separate[d]." *Id.* at 1065.

Barthelemy argued that § 1432(a) "unconstitutionally discriminates on the basis of his parents' former marital status." *Id.* We evaluated his equal protection challenge under the rational basis standard because we interpreted *Fiallo v. Bell*, 430 U.S. 787 (1977), as precluding application of any more exacting scrutiny. We understood *Fiallo* to instruct that "Congress has nearly plenary power to establish the qualifications for citizenship." *Barthelemy*, 329 F.3d at 1065.

---

United States while under the age of eighteen years.

8 U.S.C. § 1432(a).

Applying rational basis review, we held that the statutory scheme in § 1432(a) had the legitimate objective of "protect[ing] . . . parental rights." *Id.* at 1066. Congress generally required both parents to naturalize, we reasoned, because "[i]f United States citizenship were conferred to a child where one parent naturalized, but the other parent remained an alien, the alien's parental rights could be effectively extinguished." *Id.* Consistent with that rationale, Congress exempted from the two-parent-naturalization requirement those children whose non-citizen parent had fewer or no rights to protect: children with a deceased parent, a separated parent without legal custody, or an unknown father. *See id.*

## B.

As a prior decision of our court, *Barthelemy* is binding unless it is "clearly irreconcilable with the reasoning or theory of intervening higher authority." *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc). Mayea argues that the Supreme Court's decision in *Sessions v. Morales-Santana*, 137 S. Ct. 1678 (2017), is intervening higher authority that "effectively overruled" *Barthelemy*. *See Miller*, 335 F.3d at 893.

In *Morales-Santana*, the Supreme Court held that the statutory scheme at 8 U.S.C. §§ 1401(g) and 1409, which imposed different requirements on unwed mothers and unwed fathers for conferring citizenship upon the birth of a child abroad, denied equal protection. 137 S. Ct. at 1700–01. Under that scheme, when a child was born abroad to unmarried parents, only one of whom was a U.S. citizen, the U.S.-citizen parent could transmit citizenship to the child at birth by being physically present in the United States for a specified period prior to the child's birth. *Id.* at 1686. For an unmarried U.S.-citizen father, five years of physical

presence was required. *Id.* But for an unmarried U.S.-citizen mother, one year sufficed. *Id.* By comparison, for married couples in which only one of the spouses was a U.S. citizen, the physical-presence requirement for the citizen parent was five years regardless of gender. *Id.*[5]

*Morales-Santana* subjected this statutory scheme to heightened scrutiny because it "differentiate[d] on the basis of gender" between unmarried mothers and unmarried fathers. *Id.* at 1689–90 (explaining that "heightened scrutiny . . . attends 'all gender-based classifications'" (quoting *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 136 (1994))). In explaining this approach, the Court clarified that *Fiallo* did not mandate the application of rational basis review for all equal protection challenges to immigration statutes. Rather, *Fiallo* "disclaimed . . . the application of an exacting standard of review" for statutes that involved Congress's power to admit non-citizens, but not for statutes governing claims of citizenship. *Id.* at 1693–94.

The Court then held that the physical-presence requirements in 8 U.S.C. §§ 1401(g) and 1409 failed to withstand heightened scrutiny. As the legislative history revealed, those requirements were the product of two beliefs: the "[f]ear[] that a foreign-born child could turn out more alien than American in character," and the assumption that the "unwed mother is the natural and sole guardian of a nonmarital child." *Id.* at 1691–92 (quotation marks omitted). Congress reasoned that "there was no need for a

---

[5] For married couples in which both spouses were citizens, it was enough for either parent to "ha[ve] had a residence in the United States or one of its outlying possessions, prior to the birth of [the child]." *Morales-Santana*, 137 S. Ct. at 1695 n.18 (second alteration in original) (quoting 8 U.S.C. § 1401(c)).

prolonged residency prophylactic" for unwed citizen mothers, because "[t]he alien father, who might transmit foreign ways, was presumptively out of the picture." *Id.* at 1692. By contrast, a lengthy residency requirement was necessary for unwed citizen fathers to have the chance to "counteract the influence" of the presumably devoted non-citizen mother. *Id.* The Court concluded that the "stunningly anachronistic" gender stereotypes animating the statutory scheme served no important governmental interest. *Id.* at 1692–93.

Finally, the Court determined that the proper remedy was to subject both unwed mothers and unwed fathers to the more stringent five-year physical-presence rule. *Id.* at 1698–1701. The Court pointed out that the alternative—extending the more favorable one-year rule to unwed mothers and fathers alike—would have the "irrational" effect of making it easier for the children of unmarried parents, only one of whom was a citizen, to receive citizenship, compared to the children of similarly situated married parents, to whom the five-year rule applied. *Id.* at 1700. Remarking that Congress could not have intended to favor "nonmarital children" over "marital children" in this way, the Court observed in a footnote: "Distinctions based on parents' marital status, we have said, are subject to the same heightened scrutiny as distinctions based on gender." *Id.* at 1700 & n.25.

Mayea's argument from *Morales-Santana* proceeds in two steps. First, he argues that *Morales-Santana* dispensed with the categorical rule of deference to immigration-related statutes we applied in *Barthelemy*. Second, he contends that footnote 25 of *Morales-Santana* requires us to apply heightened scrutiny to the parental marital status classification in § 1432(a).

Mayea is right about the first step.  We agree that *Barthelemy*'s reason for applying rational basis review is irreconcilable with the reasoning in *Morales-Santana*.  But because he is wrong about the second step, his attempt to do away with *Barthelemy*'s holding fails.  We conclude that rational basis review applies to § 1432(a) for reasons separate and apart from those relied on in *Barthelemy*.  And *Barthelemy*'s holding that § 1432(a) is rational is not irreconcilable with *Morales-Santana*, so we remain bound by that portion of *Barthelemy*'s reasoning and thus by its ultimate holding that § 1432(a) is constitutional.

**1.**

Like the statutes examined in *Morales-Santana*, § 1432(a) governs the acquisition of citizenship, not the admission or exclusion of non-citizens.  We therefore agree with Mayea that *Barthelemy*'s justification for applying rational basis review—that immigration statutes must always be given deference and thus reviewed only for rationality—is "clearly irreconcilable" with *Morales-Santana*'s clarification of the scope of deference to Congress on immigration issues, which prior cases such as *Fiallo* had described.  *See Miller*, 335 F.3d at 893.  We have already held as much in *Dent v. Sessions*, 900 F.3d 1075 (9th Cir. 2018), where we recognized that "*Morales-Santana* dictates that . . . equal protection claims do not necessarily receive rational basis review simply because they are in the immigration context."  900 F.3d at 1081.

*Morales-Santana* thus left open the possibility that a court may apply heightened scrutiny to a citizenship provision if there is otherwise a basis to do so.  As we explained in *Dent*, when faced with a citizenship statute we simply proceed "as we would in a non-immigration equal

protection claim": by determining whether the statute classifies on a basis that triggers heightened scrutiny. *Id.*

## 2.

We highlight at the outset that, contrary to Mayea's characterization, § 1432(a) does not discriminate on the basis of parental marital status in and of itself. The statute's general rule requires the naturalization of both parents to transmit citizenship to their child. 8 U.S.C. § 1432(a)(1). To trigger the exception in § 1432(a)(3) that allows a child to derive citizenship upon the naturalization of one parent, the statute requires *both* "a legal separation of the parents" *and* that the naturalizing parent have sole "legal custody of the child." *See Wedderburn v. INS*, 215 F.3d 795, 800 (7th Cir. 2000) (observing that § 1432(a)(3) "requires proof of both 'legal custody' and 'legal separation'"). For the reasons that follow, we conclude that neither requirement imposes a suspect classification that triggers heightened scrutiny.

## 3.

The parties have failed to identify any decision from our court or the Supreme Court evaluating what level of scrutiny applies to classifications of children based on their parents' marital status at a time after their birth or on a parent's custody status over them, and we are aware of none.

Therefore, to determine in the first instance the appropriate level of scrutiny to apply to § 1432(a), we begin by asking whether the statute implicates a class of people who have "experienced a history of purposeful unequal treatment or been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities." *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 313 (1976) (quotation marks omitted); *see Hibbs v. Dep't of*

*Human Res.*, 273 F.3d 844, 856 (9th Cir. 2001) (explaining that the "application of heightened scrutiny to . . . gender discrimination is justified largely on the basis" that such discrimination reflects "a history of purposeful unequal treatment," and that "[g]ender differences are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy" (citation and quotation marks omitted)), *aff'd*, 538 U.S. 721 (2003).

We are unaware of any evidence that classifications based on whether parents are legally separated after their child's birth or whether one parent has sole legal custody over their child reflect historical purposeful discrimination or legal disadvantage, and Mayea has pointed to none. Nor do the other considerations in our usual test for determining whether heightened scrutiny applies suggest that such scrutiny is warranted here. *See Karnoski v. Trump*, 926 F.3d 1180, 1200 & n.17 (9th Cir. 2019) (citation omitted) (discussing the four-part test: "A) whether the class has been historically subjected to discrimination; B) whether the class has a defining characteristic that frequently bears a relation to ability to perform or contribute to society; C) whether the class exhibits obvious, immutable or distinguishing characteristics that define them as a discrete group; and D) whether the class is a minority or politically powerless").[6]

---

[6] We recognize that there has been discrimination against subgroups within or otherwise related to the classifications in § 1432(a). For example, children with unmarried same-sex parents have faced discrimination in some contexts, but that has more to do with discrimination on the basis of sexual orientation than on the basis of the classifications at issue here. *See* Benjamin G. Ledsham, *Means to Legitimate Ends: Same-Sex Marriage Through the Lens of Illegitimacy-Based Discrimination*, 28 Cardozo L. Rev. 2373, 2375 (2007) ("[D]iscrimination against children of same-sex couples because of their

We therefore conclude that rational basis review applies to Mayea's challenge to § 1432(a).

This conclusion is consistent with the Seventh Circuit's statement in *Wedderburn* that "the conjunction [in § 1432(a)(3)] of 'legal separation' with 'legal custody' does not concern any suspect class," and therefore that "a rational basis is enough to defeat a constitutional challenge" to the statute. *See* 215 F.3d at 800. Similarly, the Second Circuit has held that "§ 1432(a) does not discriminate on the basis of a protected class." *Pierre v. Holder*, 738 F.3d 39, 51 (2d Cir. 2013).

## 4.

Mayea's arguments against application of rational basis review are unavailing. First, he argues that the Supreme Court has applied heightened scrutiny to legal distinctions based on parental marital status. But the cases Mayea cites for that proposition all involved discrimination based on a child's "legitimacy"—whether the child's parents were married at the time of the child's birth. *See Child*, Black's Law Dictionary (11th ed. 2019) (defining "legitimate child" as "a child conceived or born in lawful wedlock").[7] It is well-established that legitimacy classifications are subject to intermediate scrutiny due to the historical discrimination faced by "illegitimate" children. *See Clark v. Jeter*, 486 U.S.

---

parentage persists."). And, of course, there have been "illegitimacy" based classifications motivated by historical discrimination against children whose parents were not married at the time of their birth, which we discuss below.

[7] The terms "marital child" and "nonmarital child" are increasingly being used in lieu of "legitimate child" and "illegitimate child." *See Nonmarital Child*, Black's Law Dictionary (11th ed. 2019).

456, 461 (1988) (holding that "classifications that burden illegitimate children for the sake of punishing the illicit relations of their parents" must be "substantially related to an important governmental objective"); *Weber v. Aetna Cas. & Sur. Co.*, 406 U.S. 164, 175 (1972) ("The status of illegitimacy has expressed through the ages society's condemnation of irresponsible liaisons beyond the bonds of marriage. But visiting this condemnation on the head of an infant is illogical and unjust.").

But § 1432(a) does not contain a legitimacy classification. The first clause of § 1432(a)(3) looks to parental marital status at the time either parent naturalizes, rather than at the time of the child's birth. A nonmarital child would automatically derive citizenship under § 1432(a)(3) if his parents later married and then legally separated, the same as a marital child whose parents were married at his birth but later separated. *See Levy v. U.S. Attorney Gen.*, 882 F.3d 1364, 1367–68 (11th Cir.) ("The clause does not require that a child be born into wedlock: a child born out of wedlock whose parents later marry and legally separate qualifies under § 1432(a)(3)."), *cert. denied*, 138 S. Ct. 1168 (2018); *Pierre*, 738 F.3d at 51 ("[T]he distinction drawn in § 1432(a)(3) did not reflect discrimination based on legitimacy."). Because the first clause of § 1432(a) does not classify individuals based on legitimacy, the line of cases on which Mayea relies is inapposite.

Mayea next seizes on a footnote in *Morales-Santana* to argue that *all* parental marital status classifications warrant intermediate scrutiny. That footnote states: "Distinctions based on parents' marital status, we have said, are subject to the same heightened scrutiny as distinctions based on gender." *Morales-Santana*, 137 S. Ct. at 1700 n.25. Read in context, it is clear that the footnote, too, refers to the

Supreme Court's precedent holding that legitimacy, rather than parental marital status more generally, is a suspect classification that triggers more exacting review.  To begin with, the footnote cites *Jeter*, in which the Court held that "classifications that burden illegitimate children for the sake of punishing the illicit relations of their parents" are subject to intermediate scrutiny.  486 U.S. at 461.  *Jeter* did not extend heightened scrutiny to all classifications based on parental marital status.

Moreover, the *Morales-Santana* footnote concerns a hypothetical legitimacy classification.  As explained above, the footnote was part of a section in *Morales-Santana* discussing how to rectify the unconstitutionality of a statutory scheme that required an unmarried U.S.-citizen father with a child born abroad to be physically present in the United States for five years prior to the child's birth in order for the father to transmit his citizenship to the child, whereas an unmarried mother could do the same after only one year of physical presence.  137 S. Ct. at 1686, 1698–1701.  The Court declined to extend the one-year rule to unwed fathers because that rule would have made it easier for parents who were unmarried at the time of their child's birth to transmit their citizenship than for parents who were married at the time of their child's birth to do so.  *Id.* at 1700; *see also id.* at 1686 (noting that the latter group of parents was subject to the five-year rule).  It was this hypothetical that prompted the Court to observe that "[d]isadvantageous treatment of marital children in comparison to nonmarital children is scarcely a purpose one can sensibly attribute to Congress," and to append the footnote underscoring that such differential treatment—turning on legitimacy—would have to withstand heightened scrutiny.  *Id.* at 1700 & n.25; *see United States v. Muckleshoot Indian Tribe*, 235 F.3d 429, 433 (9th Cir. 2000) (instructing that when interpreting

judicial opinions, "the language of the court must be read in the light of the facts before it" (quotation marks omitted)).

The Court's use of the phrase "we have said" in the footnote reinforces the conclusion that it was referring to legitimacy-based classifications. *Id.* at 1700 n.25 ("Distinctions based on parents' marital status, *we have said*, are subject to the same heightened scrutiny as distinctions based on gender." (emphasis added)). In Mayea's own words, by the time *Morales-Santana* was decided, "the Supreme Court ha[d] long held that distinctions based on legitimacy" are subject to intermediate scrutiny. *See, e.g.*, *Jeter*, 486 U.S. at 461; *Pickett v. Brown*, 462 U.S. 1, 8 (1983); *Mills v. Habluetzel*, 456 U.S. 91, 98–101 (1982); *United States v. Clark*, 445 U.S. 23, 26–27 (1980); *Lalli v. Lalli*, 439 U.S. 259, 265 (1978) (plurality opinion); *Trimble v. Gordon*, 430 U.S. 762, 767 (1977); *Weber*, 406 U.S. at 175–76. By contrast, to our knowledge the Court has never applied heightened scrutiny to classifications based on parental marital status outside the legitimacy context.[8] We therefore understand the footnote as invoking the well-established line of precedent, culminating in *Jeter*, applying heightened scrutiny to legitimacy classifications. Indeed, it would have been strange for the Court in *Morales-Santana* to claim that it "ha[d] said" all classifications based on parents' marital status are subject to heightened scrutiny when in fact it had never done so. *See* 137 S. Ct. at 1700 n.25.

In sum, Mayea's attempts to resist application of rational basis review are unavailing.

---

[8] Indeed, Mayea concedes that "parents' marital status and illegitimacy are not always the same thing."

**5.**

Reviewing § 1432(a) for a rational basis, we remain bound by our holding in *Barthelemy* that the statute survives that deferential standard.  As we explained in *Barthelemy*, the distinctions drawn by that statutory provision are rationally related to the legitimate government interest in protecting the parental rights of the non-citizen parent. 329 F.3d at 1066.**[9]**  By permitting a naturalizing parent to unilaterally transmit citizenship to a child only when that parent is legally separated from the other parent and has sole legal custody over the child, § 1432(a) ensures that the non-citizen parent's possible "desire that [their child] not become a United States citizen is honored." *Id.* at 1066–67; *see also Levy*, 882 F.3d at 1368; *Pierre*, 738 F.3d at 51.  The alternative—allowing a naturalizing parent to transmit citizenship without regard to the wishes of a non-citizen parent who has equal interests with respect to their child— could result in the "naturalizing parent . . . usurping the parental rights of the [non-citizen] parent." *Barthelemy*, 329 F.3d at 1066.

Even if we were not bound by *Barthelemy*, we would conclude that § 1432(a) is rational.  Although Mayea argues that § 1432(a) fails rational basis review because *Morales-*

---

**[9]** Although it appears that the *Barthelemy* petitioner's circumstances may have implicated only the marital status classification in § 1432(a) and not also the custody classification, our discussion of the statute's rational approach to protecting parental rights touched on both.  *See Barthelemy*, 329 F.3d at 1066 & n.4.  And to the extent *Barthelemy* should be read as only reaching a holding about the marital status classification, we reach the same conclusion as to the custody classification.  Protecting the parental rights of parents with custody rights is a legitimate legislative purpose, and § 1432(a)'s treatment of custody status furthers that purpose.

*Santana* explained that discriminating against married parents is "scarcely a purpose one can sensibly attribute to Congress," 137 S. Ct. at 1700, discriminating against married parents is not the purpose behind § 1432(a). Protecting the parental rights of the non-citizen parent is. *See Barthelemy*, 329 F.3d at 1066–67. That is plainly a legitimate legislative purpose. *See United States v. Casasola*, 670 F.3d 1023, 1028–29 (9th Cir. 2012) (citing cases from other circuits also holding that protecting the parental rights of a non-citizen parent is a legitimate legislative purpose). Mayea does not contest this principle. Nor does he dispute that § 1432(a) furthers the purpose of protecting parental rights. Accordingly, we conclude that § 1432(a) does not deny equal protection.[10]

## IV.

For the foregoing reasons, we **AFFIRM**.

---

[10] Mayea makes an additional argument that, by invalidating the citizenship statute at 8 U.S.C. § 1409(c), *Morales-Santana* invalidated the entire definition of "alienage" in the Immigration and Nationality Act. And because alienage is an element of the illegal reentry statute at 8 U.S.C. § 1326, Mayea insists that statute is itself unconstitutional. But Mayea offers no explanation as to why § 1326 cannot be "fully operative" after § 1409(c), a wholly distinct provision, has been invalidated and thus severed from the remainder of the immigration statutes. *See INS v. Chadha*, 462 U.S. 919, 932–34 (1983) (explaining that pursuant to the Immigration and Nationality Act's severability clause, an unconstitutional provision is severed and the rest of the statutory scheme survives "if what remains after severance is fully operative as a law" (citation and quotation marks omitted)). Section 1326 remains intact after *Morales-Santana*.